**AFFIRM; and Opinion Filed May 1, 2014.**



In The

# Court of Appeals
# Fifth District of Texas at Dallas

### No. 05-13-00200-CR

**HAROLD DAVIS, Appellant**
**V.**
**THE STATE OF TEXAS, Appellee**

**On Appeal from the 292nd Judicial District Court**
**Dallas County, Texas**
**Trial Court Cause No. F09-60174-V**

## OPINION

Before Justices FitzGerald, Fillmore, and Evans
Opinion by Justice Fillmore

A jury found appellant Harold Davis guilty of capital murder, and punishment of an automatic life sentence was assessed. *See* TEX. CODE CRIM. PROC. ANN. art. 37.071, § 1 (West Supp. 2013) (if defendant is found guilty in a capital felony case in which the State does not seek the death penalty, the judge shall sentence defendant to life imprisonment or to life imprisonment without parole as required by section 12.31 of the penal code). In three issues, Davis contends the evidence is legally insufficient to support the offense of capital murder because the State failed to prove that the primary actor intentionally caused the victim's death and that Davis was a party or a party conspirator to the offense, and the abstract portion of the jury charge contained an improper definition of capital murder. We affirm the trial court's judgment.

## Background

On the night of October 11, 2009, Kimheng Lay was shot and killed during a robbery at a convenience store on Harry Hines Boulevard in Dallas, Texas, at which he worked. For his alleged participation in the robbery that resulted in Lay's death, Davis was tried for capital murder.

At Davis's trial, the jury heard the testimony of Lay's wife, Kimsreang Rugg. Just prior to the shooting of Lay, Rugg was on the phone with him. Rugg testified that Lay told her he knew "this guy is going to rob him." Rugg told Lay to give the money to the robber, and he did.

Kimleange Herndon, Rugg's cousin and Lay's employee, testified at trial. Herndon worked for Lay as a cashier, stocker, and cleaner at the convenience store. The night of October 11, 2009, Herndon was cleaning in the wine area of the store. An Hispanic male wearing a black jacket with the hood up and sunglasses approached her. The man pulled a gun and told her to go to the cash register area and get money from the cash registers. Lay was at the cash register area and helped give the man the money from the registers. The man said he needed the money and "just give me the money." The man had a gun that was visible the entire time. After the man got the cash, and as he was leaving the store, Lay took out a gun. Herndon laid on the floor and was not able to see more of what transpired. She heard gunshots, and Lay fell to the floor. Herndon told the police after the incident that she believed Lay fired his gun before the robber fired his gun. Herndon called 9-1-1. She did not get a look at the person who was driving the car away from the scene or anything that happened outside the store.

William Glenn testified at trial. At around 11:00 p.m. on October 11, 2009, he had driven his brother-in-law, Anthony McCoy, to the convenience store to buy some beer. Glenn waited in his truck while McCoy went into the convenience store. McCoy knocked on the glass inside the store to get Glenn's attention. Glenn could not hear what McCoy was trying to tell

him. Glenn got out of his truck and was able to hear McCoy telling him to call the police. Glenn called 9-1-1 and told the operator responding to that call that a robbery was taking place. While Glenn was on the phone, a man "fell out the front door" of the convenience store. When the man fell to the ground, a gun "kicked out," and the man reached out and grabbed the gun. The man crawled toward the street, and a car pulled up from the motel across the street, the passenger door of the car opened, and the driver of the car pulled the man into the vehicle. The car was a dark colored four door model. Glenn was able to identify the first two letters of the vehicle's license plate as "SP." Glenn gave this information to the police when they arrived at the scene. Glenn believes he told the police the vehicle was dark green.

Juan Green, who was incarcerated in the Dallas County Jail for a drug offense at the time of Davis's trial, testified. Green had known Davis for about seven years and knew Davis to own a Mercedes-Benz. Green testified that soon after October 11, 2009, Davis, nicknamed "Scooby," asked Green to clean Davis's Mercedes-Benz. When cleaning the vehicle, Green saw something "like cherry pie filling" on the passenger door. Green talked to Davis about his belief that someone had been eating food in and had soiled Davis's car. Davis "enlightened" Green that it was not food that Green saw in the car, but was, rather, "leg bits." Davis explained that there had been a "botched robbery" involving him and Rudy Bonilla. Davis told Green that Bonilla was supposed to go into the convenience store, wave his gun around, get the money, exit the store, and get into the car, and Davis and Bonilla would leave the scene. Davis told Green that when "doing" the robbery with Bonilla, Bonilla went into the store, Bonilla "tried to do too much," and the owner of the store shot at Bonilla. Davis told Green that Bonilla fired back and killed the store owner. The store clerk shot Bonilla in the leg, and Bonilla crawled out of the store. Davis had to drive his car around and pick up Bonilla. When Bonilla closed the car door,

–3–

his injured leg contacted the car door leaving the residue from his injury that Green mistook for "cherry pie filling" when cleaning Davis's car.

Concerned that he had cleaned the vehicle used as the getaway car in the robbery Davis described, Green contacted the police and told them what he knew about the robbery. Within a few days of October 11, 2009, Green was interviewed by Dale Lundberg, a detective in the homicide unit of the Dallas Police Department.

Lundberg testified at trial. In the early hours of October 12, 2009, Lundberg responded to the convenience store crime scene. Lundberg testified Lay was shot twice and sustained injuries to his eye and his arm. Lay died at the scene.

The jury viewed photographs and videotapes from three of the security surveillance cameras at the convenience store, and Lundberg testified regarding those photographs and the contents of the videotapes. Videotape footage showed an individual in a blue shirt entering the convenience store. Lundberg later learned that individual was McCoy. An individual, later identified as Bonilla, is shown walking from the direction of the Cole Manor Motel, or from the direction of Empire Central Drive, into the convenience store. The videotape footage does not show Bonilla getting out of a vehicle. Bonilla was wearing sunglasses and a black hooded jacket with the hood pulled over his head. Bonilla entered the convenience store. Lay was behind the cashier's counter where the cash registers were located, an area located adjacent to the front door. Bonilla went to the area of the store where Herndon was working. He then forced Herndon at gunpoint to the cashier's counter. McCoy raised his hands in the air.

The video footage then showed that Bonilla moved behind the cashier's counter and aimed his gun at Lay. At gunpoint, Lay removed cash from the cash registers. Bonilla also removed cash from the cash registers. Bonilla then moved toward the front door. Lay pulled out a pistol. Lay fired his pistol twice at Bonilla. Bonilla fell, but pulled himself up. With his gun

–4–

in his right hand, Bonilla aimed at where Lay was crouched. Lay's body jolted and moved upward slightly. Debris scattered on the countertop above Lay's head. Lay dropped to the floor. McCoy is shown on the videotape facing the parking lot making a gesture with his hand indicating that Glenn should make a phone call. Bonilla hobbled out of the store and then is seen crawling away from the store in the direction of the Cole Manor Motel. What appears to be headlights are visible in the top left-hand corner of the videotape footage. Those headlights appear to be across the street in the direction of the Cole Manor Motel or moving eastbound on Empire Central Drive. The videotapes do not show Bonilla getting into a vehicle after he left the convenience store.

Lundberg talked to Glenn at the scene. Glenn described seeing a four-door "Honda-like" vehicle that was "like the color of money" driving from the scene of the robbery. Glenn provided the first two digits of the vehicle's license plate as "SP." Glenn told the police that the first time he saw the vehicle, it was stopped at a traffic light at the intersection of Harry Hines Boulevard and Empire Central Drive, and the vehicle made a left turn at the intersection. Lundberg testified that the headlights seen on the convenience store security surveillance videotape would be consistent with a car turning from Harry Hines Boulevard onto Empire Central Drive.

Lundberg testified that within a few days of the robbery, the Dallas Police Department received a lead in the case from an informant who said he knew the identity of one of the individuals involved in the convenience store robbery and where that individual was at the time. Based on this lead, Lundberg met with several individuals. One of the individuals, Randy Anderson, told Lundberg the location of a person he referred to as "Scooby," who Anderson had spoken with and knew was involved in this offense. Anderson also referred Lundberg to Heather

Sims. Anderson said "Scooby" and Sims were at an apartment complex located in Grand Prairie, Texas. Lundberg went to that location and made contact with Sims.

The police had been told drugs were being sold at the apartment complex, and Lundberg arranged to have undercover narcotics officers attempt to purchase drugs at that location in the hope that the person known as "Scooby" would offer to sell drugs to the undercover officers. The police could then obtain an arrest warrant and a search warrant for that location. However, that undercover narcotics plan was not successful.

A vehicle was located in the apartment complex parking lot that matched the description of the vehicle driving from the scene of the convenience store robbery. The vehicle was a dark-colored, two-door Mercedes-Benz. Lundberg testified that the vehicle is an unusual color, "kind of bluish-green," depending on the lighting. The vehicle's license plate number was SPR625. The license and registration established it was owned by Harold Davis and Angela Davis.

Lundberg testified that Davis voluntarily came out of his apartment, surrendered to the police, and was placed under arrest. Bonilla was arrested soon thereafter.

Dallas Police Department detective John Palmer testified at trial. Working in the homicide division of the department, Palmer was involved in the investigation of the case. Palmer arrested Bonilla at a storage unit in Grand Prairie, Texas. Bonilla had a gunshot wound to one of his thighs. Bonilla was charged with murder.

Palmer obtained consent from Davis to search Davis's 2002 Mercedes-Benz. Palmer interviewed Davis after his arrest, and the jury viewed excerpts of that interview. Davis stated he was known by the nickname "Scooby." Davis denied he was present at the robbery and denied driving his Mercedes-Benz at the scene of the robbery. Davis said Bonilla arranged to pay Davis for the use his car. Davis acknowledged he knew what Bonilla was going to do, and told Palmer that he allowed Bonilla to use his car. Davis acknowledged that his car was "implicated

–6–

already," but Davis said no one could "put" him at the scene of the crime. Davis told Palmer that the "witnesses" who claimed to know about the crime being investigated were people at the apartment complex where Davis lived, but there was no one at the scene of the crime who could place Davis there. Davis stated he knew he was implicated, or he would not have been at the police station being interrogated.

Davis said he knew Bonilla "got away with some money" from the robbery. Davis told Palmer that Bonilla was supposed to pay Davis, but he did not. Davis told Bonilla, "You are going to pay me or you are going to pay the hospital." Davis said Bonilla was "completely out of control," and Lay's death was a senseless murder. Davis said, "It went one way, turned out another way; I don't think nobody planned it to turn out the way it did." Davis told Palmer that he knew a lot more than what he was saying, but if it was not going to benefit him, "why should I say it?"

Dallas County medical examiner, Janice Townsend-Parchment, M.D., testified at trial. Townsend-Parchment testified regarding the autopsy performed on Lay. Lay had two gunshot wounds. One bullet entered Lay's right forearm, traveled downward, and was recovered from where it lodged in Lay's elbow. Another bullet entered the corner of Lay's left eye and exited through the left occipital scalp, with the bullet moving from front to back and traveling slightly downward and from right to left. Townsend-Parchment does not know which was the first bullet wound. However, she testified that an injury like the gunshot wound to Lay's head would render a person instantly unconscious, causing the person to collapse and inevitably die. The autopsy revealed the cause of Lay's death was a gunshot wound to the head, with a gunshot wound of an extremity. The manner of death was found to be homicide.

Dallas Police Department detective Richard Dodge testified at trial. On October 11, 2009, Dodge was assigned to the physical evidence section of the police department. Dodge

–7–

testified regarding photographs taken and physical evidence recovered at the convenience store. Spent bullet cartridges, a bullet recovered from inside the front door, and Lay's weapon were collected at the scene. Two shots were fired from Lay's gun. Dodge testified no spent bullet cartridges were collected in connection with gunshots fired by the other shooter. Dodge explained that the other shooter could have been using a revolver or an automatic weapon that does not eject cartridges or there could have been cartridges that were never located at the scene. Blood drops on the ground inside and outside the front door of the convenience store were collected to be submitted to a laboratory for DNA testing.

Charles Clow, who worked in October 2009 at the Southwestern Institute of Forensic Sciences (SWIFS), also known as the Dallas County Crime Laboratory, testified at trial. Clow performed analysis of items involved in the homicide. Lay's semiautomatic .45 caliber pistol was recovered at the convenience store and tested by Clow. The semiautomatic weapon ejects fired shell casings, and Clow was able to examine two shell casings ejected from Lay's weapon. The bullet recovered from Lay's body during autopsy was fired from a larger .38 or .357 caliber weapon. Based on the design and caliber of that bullet, Clow determined the bullet was most likely fired from a revolver. Clow testified that .38 Specials and .357 Magnums are very common revolver calibers. Clow testified that there are semiautomatic weapons that might be able to fire that caliber of ammunition, but they are not as prevalent as the revolver weapons. Clow did not have the gun used to shoot Lay, and, therefore, he could not say what trigger force would have been required for repetitive shots from the weapon.

Sandra Lewis-Krick testified regarding the search and analysis of Davis's vehicle in her capacity as a crime scene analyst with the Dallas Police Department. Davis's blue-green colored Mercedes-Benz, with license plate number SPR625, was located in the Dallas Police Department pound. Lewis-Krick took swabs of a reddish brown stain located on the side of the front

passenger seat near the door in order to perform testing to determine whether the stain was blood. The test indicated the stain was blood, but that particular test does not indicate whether blood is of human or animal origin, and the test can give a false positive for blood.

Alexander Nham, a forensic biologist with SWIFS, screens evidence for the presence of human bodily fluids. Nham was asked to perform tests on three swabs from Davis's Mercedes-Benz submitted by the Dallas Police Department. One of the swabs was labeled "outside front door," and the other two swabs were labeled "passenger side between seat and door." The swab from "outside front door" was positive for the presence of human blood. The swabs labeled "passenger side between seat and door" were presumptively positive for blood, however there was not enough sample in the swabs to perform a second test to confirm the presence of blood. Therefore, Nham conserved those samples for DNA analysis.

Angela Fitzwater, forensic biologist at SWIFS, testified. Her primary duty at SWIFS is DNA analysis. Evidence was submitted to Fitzwater for analysis: an autopsy blood standard from Lay, a buccal swab standard from Bonilla, and sample swabs from Davis's Mercedes-Benz labeled "outside front door" and "passenger between seat and door." The DNA profile obtained from the swab from "outside front door" was from a male and matched the DNA profile of Bonilla. One of the swabs from "passenger between seat and door" contained a very low level amount of DNA. Fitzwater was able to determine it was human DNA. The other "passenger between seat and door" swab also contained a low level amount of DNA, but Fitzwater was able to obtain a partial DNA profile. The partial DNA profile was from a male and matched the DNA profile of Bonilla. Fitzwater was not able to ascertain when the DNA contained on the swabs from Davis's Mercedes-Benz were left in the vehicle.

Davis was indicted for capital murder for his alleged involvement in the robbery that resulted in Lay's murder. The jury found Davis guilty of capital murder, and the trial court sentenced Davis to automatic life confinement. Davis filed this appeal.

## Sufficiency of the Evidence – Intent

In his first issue, Davis asserts the evidence is legally insufficient to support his conviction for capital murder because the State failed to prove the primary actor, Bonilla, intentionally caused Lay's death.

### *Standard of Review*

We review the sufficiency of the evidence under the standard set out in *Jackson v. Virginia*, 443 U.S. 307 (1979). *Adames v. State*, 353 S.W.3d 854, 859 (Tex. Crim. App. 2011). We examine all the evidence in the light most favorable to the verdict and determine whether any rational trier of fact could have found the essential elements of the offense beyond a reasonable doubt. *Jackson*, 443 U.S. at 319; *Adames*, 353 S.W.3d at 860. This standard recognizes "the responsibility of the trier of fact fairly to resolve conflicts in the testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts." *Jackson*, 443 U.S. at 319; *see also Adames*, 353 S.W.3d at 860. The jury, as the fact finder, is entitled to judge the credibility of the witnesses, and can choose to believe all, some, or none of the testimony presented by the parties. *Chambers v. State*, 805 S.W.2d 459, 461 (Tex. Crim. App. 1991). We defer to the jury's determinations of witness credibility, and may not substitute our judgment for that of the fact finder. *Brooks v. State*, 323 S.W.3d 893, 899 (Tex. Crim. App. 2010) (plurality op.); *King v. State*, 29 S.W.3d 556, 562 (Tex. Crim. App. 2000) (in conducting legal sufficiency analysis, appellate court "may not re-weigh the evidence and substitute our judgment for that of the jury").

*Analysis*

"A person acts intentionally, or with intent, with respect . . . to a result of his conduct when it is his conscious objective or desire to engage in the conduct or cause the result." TEX. PENAL CODE ANN. § 6.03(a) (West 2011). Murder is a "result of conduct" offense. *Cook v. State*, 884 S.W.2d 485, 490 (Tex. Crim. App. 1994). "That is, the accused must have intended the result, death, or have been aware that his conduct was reasonably certain to cause that result." *Guzman v. State*, 20 S.W.3d 237, 240 (Tex. App.—Dallas 2000), *rev'd on other grounds*, 85 S.W.3d 242 (Tex. Crim. App. 2002).

The jury may infer the intent to kill from the defendant's acts, words or conduct, *Hall v. State*, 418 S.W.2d 810, 812 (Tex. Crim. App. 1967) (quoting *Kincaid v. State*, 198 S.W.2d 899, 900 (Tex. Crim. App. 1946)), *see also Guevara v. State*, 152 S.W.3d 45, 50 (Tex. Crim. App. 2004) (intent may be inferred from circumstantial evidence such as acts, words, and conduct of accused), and from any facts in evidence it believes prove the existence of that intent, such as the use of a deadly weapon. *Brown v. State*, 122 S.W.3d 794, 800 (Tex. Crim. App. 2003). If the record supports conflicting inferences, we must presume that the fact finder resolved the conflicts in favor of the prosecution and defer to that determination. *See Jackson*, 443 U.S. at 326. Further, "[c]ircumstantial evidence is as probative as direct evidence in establishing the guilt of an actor, and circumstantial evidence alone can be sufficient to establish guilt." *Hooper v. State*, 214 S.W.3d 9, 13 (Tex. Crim. App. 2007).

With these principles in mind, we turn to the record to determine whether the evidence is sufficient for the jury to have found beyond a reasonable doubt that Bonilla intentionally caused Lay's death. On appeal, Davis argues that it can be inferred from the videotape footage showing Bonilla crawling outside the store and the upward angle of the trajectory of the bullet in Lay's arm, that Bonilla was on the floor of the convenience store when his gun discharged. Davis

further argues that Bonilla firing two shots in quick succession indicates Bonilla's weapon inadvertently discharged. Davis contends these arguments belie a reasonable jury finding Bonilla intentionally shot Lay.

The specific intent to kill may be inferred from the use of a deadly weapon, unless the manner of its use makes it reasonably apparent that death or serious bodily injury could not have resulted. *Flanagan v. State*, 675 S.W.2d 734, 744 (Tex. Crim. App. 1984) (op. on reh'g); *see also* TEX. PENAL CODE ANN. § 1.07(a)(17)(a) (West Supp. 2013) ("deadly weapon" means "a firearm or anything manifestly designed, made, or adapted for the purpose of inflicting death or serious bodily injury"). "Naturally, the most obvious cases and the easiest ones in which to prove a specific intent to kill, are those cases in which a firearm was used and was fired or attempted to have been fired at a person." *Godsey v. State*, 719 S.W.2d 578, 581 (Tex. Crim. App. 1986). If a deadly weapon, such as a pistol, is used in a deadly manner, an intent to kill is presumed. *Livingston v. State*, 739 S.W.2d 311, 337 (Tex. Crim. App. 1987); *see also Adanandus v. State*, 866 S.W.2d 210, 215 (Tex. Crim. App. 1993) (intent to kill may be inferred from use of a deadly weapon in a deadly manner); *Womble v. State*, 618 S.W.2d 59, 64 (Tex. Crim. App. [Panel Op.] 1981) ("In fact, where a deadly weapon is fired at close range and death results the law presumes an intent to kill."); *Thompson v. State*, 521 S.W.2d 621, 622 (Tex. Crim. App. 1974) (pistol is a weapon deadly per se when fired at a victim at close range).

Here, the evidence is undisputed that Bonilla brandished a gun while robbing the convenience store. The jury viewed the convenience store videotape footage showing Bonilla forcing Herndon at gunpoint to the front of the store, McCoy raising his hands when he saw Bonilla holding a gun, and Bonilla pointing his gun at Lay while Lay emptied the cash registers. Bonilla pointed his gun at Lay and shot him twice at close range. Lay died as a result of the gunshot wound to his head, and that wound inflicted at close range could demonstrate

–12–

deliberateness. Considering the evidence, including the sequence of events depicted on the videotape footage, the jury could reasonably infer Bonilla acted with the required mental state at the time of the shooting. *See Jones v. State*, 944 S.W.2d 642, 647 (Tex. Crim. App. 1996) (stating jury may infer intent to kill from use of a deadly weapon unless it would not be reasonable to infer that death or serious bodily injury could result from use of weapon).[1]

After reviewing the evidence under the appropriate standard, we conclude a rational trier of fact could have found beyond a reasonable doubt that Bonilla intentionally caused Lay's death. We resolve Davis's first issue against him.

### Sufficiency of the Evidence – Party or Party Conspirator

In his second issue, Davis contends there is legally insufficient evidence to support his conviction for capital murder because the State failed to prove he was a party to or a party conspirator in the offense. The State responds that the evidence was sufficient to support Davis's conviction where Davis was "an active participant in this offense as the driver of the 'getaway car.'" The issue for our review is whether the evidence in this instance sufficiently established that Davis acted in such a manner as to make him criminally responsible for the murder committed by Bonilla.

"A person is criminally responsible as a party to an offense if the offense is committed by his own conduct, by the conduct of another for which he is criminally responsible, or by both." TEX. PENAL CODE ANN. § 7.01(a) (West 2011). A person is criminally responsible for an offense committed by the conduct of another if, "acting with intent to promote or assist the commission of the offense, he solicits, encourages, directs, aids, or attempts to aid the other person to commit the offense." TEX. PENAL CODE ANN. § 7.02(a)(2) (West 2011).

---

[1] *See also Hogg v. State*, No. 05-10-00231-CR, 2011 WL 2685968, at *4 (Tex. App.—Dallas July 12, 2011, pet. ref'd) (not designated for publication).

When the accused is tried as a party to an offense, the evidence must show that at the time of the offense the parties were acting together, each contributing some part toward the execution of their common purpose. *See Brooks v. State*, 580 S.W.2d 825, 831 (Tex. Crim. App. 1979); *Michel v. State*, 834 S.W.2d 64, 67 (Tex. App.—Dallas 1992, no pet.) ("A conviction under the law of parties requires a showing that, at the time of the offense, the parties were acting together, each contributing to their common purpose."). In determining whether an accused is a party to an offense and bears criminal responsibility, the court may look to events before, during, and after the commission of the offense. *Beardsley v. State*, 738 S.W.2d 681, 684 (Tex. Crim. App. 1987). Circumstantial evidence may be sufficient to show that one is a party to an offense. *Wygal v. State*, 555 S.W.2d 465, 469 (Tex. Crim. App. 1977); *Spencer v. State*, 789 S.W.2d 397, 400 (Tex. App.—Dallas 1990, no pet.) (participating in an enterprise may be inferred from circumstances and need not be shown by direct evidence).[2]

While mere presence at the scene is not enough to sustain a conviction, "it is a circumstance tending to prove guilt, which, combined with other facts, may suffice to show that the accused was a participant." *Beardsley*, 738 S.W.2d at 685; *Valdez v. State*, 623 S.W.2d 317, 321 (Tex. Crim. App. 1979) (op. on reh'g).; *Brewer v. State*, 852 S.W.2d 643, 647 (Tex. App.—Dallas 1993, pet. ref'd). A defendant can be convicted as a party if the evidence establishes that he participated in the commission of the offense by driving the getaway vehicle. *Thompson v. State*, 697 S.W.2d 413, 417 (Tex. Crim. App. 1985); *see also White v. State*, 671 S.W.2d 40, 43 (Tex. Crim. App. 1984); *Webber v. State*, 757 S.W.2d 51, 55–56 (Tex. App.—Houston [14th

---

[2] *See also Ayala v. State*, No. 05-92-02819-CR, 1994 WL 74007, at *3 (Tex. App.—Dallas March 8, 1994, no pet.) (not designated for publication).

–14–

Dist.] 1988, pet. ref'd) (evidence held sufficient to show defendant aided offender in robbery by driving getaway car).[3]

Although Davis denied his involvement in the robbery of the convenience store, Davis admitted in the police interview that he knew what Bonilla was going to do. Green testified he knew Davis was involved in the convenience store robbery. Davis asked Green to clean his car after the robbery and told Green that what Green mistook for food spilled in Davis's Mercedes-Benz was "leg bits" from Bonilla's gunshot wound sustained in the botched robbery he committed with Bonilla. Green testified Davis told him that Davis was supposed to keep his car out of sight while Bonilla robbed the convenience store. Bonilla was supposed to go into the convenience store, wave his gun around, get the money, and leave the store, but Bonilla "tried to do too much," Lay shot Bonilla, and Bonilla shot back, killing Lay. Because Bonilla was shot by Lay, Davis told Green that he had to drive around to the curb and pick up Bonilla. The jury also heard Glenn's testimony that a car came from the direction in which Bonilla was crawling from the convenience store after being shot, and that car picked up Bonilla and left the scene. Glenn provided the police the first two letters of the license plate of that car, with the car later being identified as belonging to Davis. Fitzwater testified that DNA testing of blood samples found on and in Davis's vehicle matched the DNA profile of Bonilla.

A rational jury reasonably could have believed Green's and Glenn's testimony and could have disbelieved that Davis was being truthful in denying his involvement in the robbery of the convenience store and concealing his knowledge about the offense. The jury heard Davis tell Palmer that he knew that he and his vehicle were implicated in the robbery, and he knew more than he was telling the police. A jury could have rationally inferred Davis's consciousness of

---

[3] *See also Ayala*, 1994 WL 74007, at *4; *Smith v. State*, No. 05-93-00153-CR, 1994 WL 169596, at *3 (Tex. App.—Dallas May 5, 1994, no pet.) (not designated for publication).

guilt based on Green's testimony that Davis had Green clean the Mercedes-Benz after the robbery. *See Wells v. State*, 578 S.W.2d 118, 119 (Tex. Crim. App. 1979) (recognizing attempt to conceal incriminating evidence is indicative of guilt).

Viewing the evidence in the light most favorable to the verdict, there is sufficient evidence for a jury to have found beyond a reasonable doubt that Davis knowingly aided the commission of the robbery by serving as the "getaway driver" who helped principal actor, Bonilla, flee the scene, thus supporting Davis's conviction as a party to the murder. *See Johnson v. State*, 853 S.W.2d 527, 534 (Tex. Crim. App. 1992) (holding that an individual may be found guilty of capital murder based on the law of parties). Having concluded a rational jury could have found Davis was a party to the robbery that resulted in Lay's murder, the evidence is sufficient to support Davis's conviction. We resolve Davis's second issue against him.

## Jury Charge

In his third issue, Davis asserts the abstract portion of the jury charge contained an improper definition of capital murder, and the improper definition caused him egregious harm. The State responds that the abstract portion of the jury charge may be erroneous, but no reversible error occurred.

### Standard of Review

Our first duty in analyzing a jury-charge issue is to decide whether error exists. *Barrios v. State*, 283 S.W.3d 348, 350 (Tex. Crim. App. 2009) (citing *Ngo v. State*, 175 S.W.3d 738, 743 (Tex. Crim. App. 2005)). If error exists, we must determine whether the error caused sufficient harm to warrant reversal. *Ngo*, 175 S.W.3d at 743–44. When, as in this case, the error was not objected to, the error must be "fundamental" and requires reversal "only if it was so egregious and created such harm that the defendant 'has not had a fair and impartial trial.'" *Barrios*, 283 S.W.3d at 350 (quoting *Almanza v. State*, 686 S.W.2d 157, 171 (Tex. Crim. App. 1985) (op. on

–16–

reh'g)). Egregious harm is the type and degree of harm that affects the very basis of the case, deprives the defendant of a valuable right, or vitally affects a defense theory. *Allen v. State*, 253 S.W.3d 260, 264 (Tex. Crim. App. 2008). In making an egregious harm determination, "the actual degree of harm must be assayed in light of the entire jury charge, the state of the evidence, including the contested issues and weight of probative evidence, the argument of counsel and any other relevant information [revealed] by the record of the trial as a whole." *Trejo v. State*, 280 S.W.3d 258, 261 (Tex. Crim. App. 2009) (quoting *Almanza*, 686 S.W.2d at 171). "[I]n making our determination, we may presume that the jury acted rationally, at least absent a showing to the contrary." *Alvarado v. State*, 912 S.W.2d 199, 216 (Tex. Crim. App. 1995) (quoting *Richardson v. State*, 879 S.W.2d 874, 882 (Tex. Crim. App. 1993)). Appellant has the burden of persuasion with respect to the requisite degree of harm. *Alvarado*, 912 S.W.2d at 216–17. The degree of harm demonstrated by the appellant must be actual, not merely theoretical. *Almanza*, 686 S.W.2d at 174. Egregious harm is a difficult standard to meet and must be determined on a case-by-case basis. *See Ellison v. State*, 86 S.W.3d 226, 227 (Tex. Crim. App. 2002).

*Analysis*

Under section 19.02(b)(1) of the penal code, a person commits murder if he "intentionally or knowingly causes the death of an individual." TEX. PENAL CODE ANN. § 19.02(b)(1) (West 2011). Section 19.03(a)(2) of the penal code provides that a person commits the offense of capital murder if the person commits murder, as defined under section 19.02(b)(1) of the penal code, and "the person intentionally commits the murder in the course of committing or attempting to commit" robbery. TEX. PENAL CODE ANN. § 19.03(a)(2) (West Supp. 2013); *see also Threadgill v. State*, 146 S.W.3d 654, 665 (Tex. Crim. App. 2004) (capital murder includes an intentional murder committed in the course of robbery); *Demouchette v. State*, 731 S.W.2d

–17–

75, 80 (Tex. Crim. App. 1986) ("phrase 'intentionally commits the murder' in Sec. 19.03(a)(2) makes 'intentional' (Sec. 6.03(a)) the culpable mental state necessary for conviction of capital murder under 19.03(a)(2)").[4]

Here, pertinent abstract portions of the jury charge provided:

PENAL OFFENSES IN TEXAS:
A person commits murder if he intentionally or knowingly causes the death of an individual.
The offense of capital murder is committed if the person commits murder, as defined above, and the person commits the murder in the course of committing or attempting to commit a robbery.

* * *

DEFINITIONS OF CULPABLE MENTAL STATES:
A person acts intentionally, or with intent, with respect to a result of his conduct when it is his conscious objective or desire to cause the result.

Pertinent application paragraphs of the jury charge provided:

APPLICATION OF THE LAW AND FACTS, CAPITAL MURDER - Party to an Offense:
You must decide whether the State has proved, beyond a reasonable doubt, that the defendant is guilty because he is criminally responsible for the commission of a crime committed by the conduct of another person. This is the case if the State has proved, beyond a reasonable doubt . . . that:
1. In Dallas County, Texas, on or about October 11, 2009, Rudy Bonilla caused the death of an individual, Kimheng Lay, by shooting Kimheng Lay with a firearm; and
2. Rudy Bonilla did this intentionally;

* * *

APPLICATION OF THE LAW AND FACTS, CAPITAL MURDER - Criminal Responsibility:
The defendant may be responsible for a capital murder committed by someone else even though the defendant himself did not intentionally cause the death of an individual, if the defendant joined an unlawful conspiracy to commit the offense. At least one member of the unlawful conspiracy must have intentionally caused the death of an individual during a robbery before the defendant can be held responsible for capital murder.

---

[4] The penal code defines robbery as follows:

A person commits an offense if, in the course of committing theft as defined in Chapter 31 and with intent to obtain or maintain control of the property, he (1) intentionally, knowingly, or recklessly causes bodily injury to another; or (2) intentionally or knowingly threatens or places another in fear of imminent bodily injury or death.

TEX. PENAL CODE ANN. § 29.02(a) (West 2011).

You must determine whether the State has proved, beyond a reasonable doubt . . . that . . .
2. In an attempt to carry out the conspiracy [to commit robbery], Rudy Bonilla intentionally caused the death of an individual, Kimheng Lay, by shooting Kinheng [sic] Lay with a firearm. . . .

At trial, Davis did not object to the jury charge, but on appeal he argues he was egregiously harmed by error in the charge. Davis asserts there was charge error because the definition of capital murder contained in the abstract portion of the jury charge did not contain the word "intentionally" immediately before the second use of the word "commits." He argues that the failure to include "intentionally" in the capital murder definition, coupled with the definition of murder containing both intentional and knowing culpable mental states, created conflict and confusion between the abstract definition of capital murder and the application paragraphs of the jury charge. Davis contends that "because the intentionality of the conduct of both Bonilla and [Davis] were such central issues in this case," the purported conflict between the abstract definition and the application paragraphs of the charge must be considered reversible error. The State responds that, although the absence of "intentionally" in the capital murder definition contained in abstract portion of the jury charge "may be erroneous," no reversible error occurred.

The application paragraph is the "heart and soul" of the jury charge. *See Vasquez v. State*, 389 S.W.3d 361, 367 (Tex. Crim. App. 2012) (application paragraph is that portion of the jury charge that applies the pertinent penal law, abstract definitions, and general legal principles to the particular facts and the indictment allegations). "It is the application paragraph of the charge, not the abstract portion, that authorizes a conviction.'" *Yzaguirre v. State*, 394 S.W.3d 526, 530 (Tex. Crim. App. 2013) (quoting *Crenshaw v. State*, 378 S.W.3d 460, 466 (Tex. Crim. App. 2012)). The Court of Criminal Appeals explained:

[T]he application paragraph is what, as a practical manner, authorizes the jury to convict but is not necessarily determinative of what legally authorizes a conviction. The application paragraph is what explains to the jury, in concrete terms, how to apply the law to the facts of the case. We look at the wording of the application paragraph to determine whether the jury was correctly instructed in accordance with the indictment and also what the jury likely relied upon in arriving at its verdict, which can help resolve a harm analysis.

*Id.* (citations omitted).[5]

Where the application paragraph of the charge correctly instructs the jury on the law applicable to the case, this mitigates against a finding that error in the abstract portion of the jury charge was egregious. *See Medina v. State*, 7 S.W.3d 633, 640 (Tex. Crim. App. 1999); *see also Patrick v. State*, 906 S.W.2d 481, 493 (Tex. Crim. App. 1995); *Kuhn v. State*, 393 S.W.3d 519, 529–30 (Tex. App.—Austin 2013, no pet.).[6] Here, the abstract portion of the charge included the proper statutory definition of murder: "a person commits murder if he intentionally or knowingly causes the death of an individual." *See* TEX. PENAL CODE ANN. § 19.02(b)(1). Immediately following the definition of murder, the abstract portion of the charge contained the following definition of capital murder: "the offense of capital murder is committed if the person commits murder, as defined above, and the person commits the murder in the course of committing or attempting to commit a robbery." The definition of capital murder in the charge departs from the statutory definition of capital murder in that it fails to limit the culpable mental state to intentional conduct. *See* TEX. PENAL CODE ANN. § 19.03(a)(2). The definition of capital murder in the charge was therefore inaccurate. However, the application paragraphs of the charge clearly instructed the jury that in order to convict Davis of capital murder as a party to the

---

[5] *See also Perez v. State*, No. 05-12-00377-CR, 2013 WL 4568296, at *8 (Tex. App.—Aug. 26, 2013, pet. ref'd) (not designated for publication).

[6] *See also Pierce v. State*, No. 05-12-01211-CR, 2013 WL 6196275, at *7 (Tex. App.—Dallas Nov. 25, 2013, no pet.) (mem. op., not designated for publication) (when application paragraph of charge correctly instructs the jury on law applicable to the case, any error in abstract instruction is not egregious); *Wilson v. State*, No. 05-10-01604-CR, 2012 WL 3264396, at *7 (Tex. App.—Dallas Aug. 13, 2012, pet. ref'd) (not designated for publication); *Hogg*, 2011 WL 2685968, at *4; *Lara v. State*, Nos. 05-02-00611-CR & 05-02-00612-CR, 2003 WL 42418, at *2 (Tex. App.—Dallas Jan. 7, 2003, pet. ref'd) (not designated for publication).

–20–

offense, it must find beyond a reasonable doubt that Bonilla intentionally caused Lay's death. The application paragraphs of the charge correctly instructed the jury on the law applicable to the case. *See Patrick*, 906 S.W.2d at 493.[7]

In an unpublished per curiam opinion, the court of criminal appeals held that an appellate court improperly limits its harm analysis when it does so without addressing all of the *Almanza* factors. *See Doughtery v. State*, PD-1411-05, 2006 WL 475802, at *1 (Tex. Crim. App. March 1, 2006) (per curiam) (not designated for publication) (citing *Almanza*, 686 S.W.2d at 157). In *Dougherty*, the appellate court had determined that error in the abstract portion of the charge did not cause egregious harm because the application paragraph properly instructed the jury. The court of criminal appeals concluded the appellate court correctly set forth the standard of review for assessing harm, but a harm analysis based on charge error could not be based only on the jury charge, and must include consideration of all the *Almanza* factors. *Id*. *But see Doughtery v. State*, 188 S.W.3d 670, 670–71 (Tex. Crim. App. 2006) (Keller, P. J., dissenting) (concluding erroneous abstract paragraph remedied by proper application paragraph without necessity of considering all *Almanza* factors). Therefore, our analysis includes consideration of all four *Almanza* factors. *See Almanza*, 686 S.W.2d at 171.[8]

The first *Almanza* factor requires consideration of the entire jury charge. *See id*. As noted above, the abstract portion of the charge included the proper statutory definition of murder but failed to recite the complete definition of capital murder. The definition of capital murder in the charge did not limit the culpable mental state to intentional conduct. However, the application paragraphs of the charge correctly instructed the jury that in order to convict Davis of capital murder as a party to the offense, it must find beyond a reasonable doubt that Bonilla

---

[7] *See also Perez*, 2013 WL 4568296, at *8.

[8] *See also Wilson*, 2012 WL 3264396, at *7; *Hogg*, 2011 WL 2685968, at *4.

–21–

intentionally caused Lay's death.  *See Medina*, 7 S.W.3d at 640; *see also Patrick*, 906 S.W.2d at 493.[9]  Davis does not contend the application paragraphs incorrectly applied the law.  We presume the jury followed the instruction in the charge, and Davis has failed to argue or to show otherwise.  *See Williams v. State*, 937 S.W.2d 479, 490 (Tex. Crim. App. 1996).  The charge as a whole does not weigh in favor of egregious harm.

With respect to the second *Almanza* factor to be considered, the "state of the evidence," Davis argued at trial that Bonilla did not intentionally cause Lay's death.  As discussed above, we have concluded there is legally sufficient evidence for a rational jury to find that Bonilla intentionally caused Bonilla's death.  This factor does not suggest Davis was egregiously harmed.

As to the third *Almanza* factor, "arguments of counsel," the State repeatedly argued regarding Bonilla's intentional conduct.  In closing argument, the State argued to the jury: "And what we have to show essentially is that Mr. Bonilla essentially intended to kill Mr. Lay.";  "[Bonilla] robbed [Lay] at gunpoint and when [Bonilla] turned and fired at Mr. Lay, multiple shots, [Bonilla] hit [Lay] clearly in the head killing him instantly.  That's intent to kill.  That gets us to murder, coupled with the aggravated robbery, that's why we are at capital murder.";  "You saw the intentional actions of Rudy Bonilla.  . . . You heard about the autopsy, that that is what caused the death.  That Rudy Bonilla did this intentionally.  Intentionally is going to be in both of the ways, so I'm going to address it at one point in time.";  "[Bonilla] did this intentionally.";  "That's intentional if you are going to fire two times. . . .  And if you shoot three times, that's for sure intentional, plain and simple.";  "Intentionally we have already talked about."  The State did

---

[9] *See also Wilson*, 2012 WL 3264396, at *8 (although abstract portion of charge erroneously defined intentionally and knowingly, application paragraph correctly limited the culpable mental states to the appropriate conduct element); *Taylor v. State*, No. 05-01-00197-CR, 2003 WL 22449157, at *3 (Tex. App.—Dallas Oct. 29, 2003, no pet.) (not designated for publication) (assuming without deciding that charge erroneously defined "intentionally" and "knowingly," application paragraph correctly limited applicable mental states to appropriate conduct element); *Urquiza v. State*, No. 08-08-00016-CR, 2010 WL 1230664, at *2 (Tex. App.—El Paso March 31, 2010, no pet.) (not designated for publication) (despite incorrect definition of "knowingly" in charge's abstract portion, application paragraph correctly applied the law).

not erroneously argue the culpable mental state necessary for the offense of capital murder.[10] We find nothing in the closing arguments to indicate Davis was egregiously harmed.

Finally, with regard to the final *Almanza* factor, we are not aware of "any other relevant information revealed by the record of the trial as a whole" that we should consider. *See Almanza*, 686 S.W.2d at 171. Although Davis argues that the jury's requests during deliberations to review the videotape of the police interview of Davis and the "witness statements of Rudy Green,"[11] "reflected the jury's uncertainty as to whether there was an intentional commission of murder in this case," we have found no support for that argument. Davis has shown us nothing in the record that supports his claim of egregious harm.

Thus, in light of the *Almanza* factors, we are unable to conclude Davis suffered egregious harm from a definition of capital murder in the abstract portion of the jury charge that failed to limit the culpable mental state to intentional conduct. Davis's third issue is resolved against him.

### Conclusion

Having resolved Davis's issues against him, we affirm the trial court's judgment.

/Robert M. Fillmore/
ROBERT M. FILLMORE
JUSTICE

Do Not Publish
TEX. R. APP. P.47

130200F.U05

---

[10] We note that during voir dire, the State repeatedly told the venire panel that it was the State's burden to prove the murder was intentional: "[W]e have to prove to you, those elements of the crime, that he intentionally caused the death of the victim in this case, Mr. Kimheng Lay, by shooting him with a firearm, which is a deadly weapon."; "But for murder, the defendant, the defendant on or about that date in Dallas County, intentionally caused the death of Mr. Kimheng ."; "[W]e have to prove to you, those elements of the crime, that he intentionally caused the death of the victim in this case, Mr. Kimheng Lay, by shooting him with a firearm, which is a deadly weapon."; "Let's talk about intent, because we say he intentionally caused the death of another person."

[11] There was no witness named Rudy Green, and Rudy Bonilla did not testify at trial. We agree with Davis's statement in his appellate brief that the jury was "obviously" referring to Juan Green.



## Court of Appeals
## Fifth District of Texas at Dallas

## JUDGMENT

HAROLD DAVIS, Appellant

No. 05-13-00200-CR         V.

THE STATE OF TEXAS, Appellee

On Appeal from the 292nd Judicial District
Court, Dallas County, Texas,
Trial Court Cause No. F09-60174-V.
Opinion delivered by Justice Fillmore,
Justices FitzGerald and Evans participating.

Based on the Court's opinion of this date, the judgment of the trial court is **AFFIRMED**.

Judgment entered this 1st day of May, 2014.

/Robert M. Fillmore/

ROBERT M. FILLMORE
JUSTICE